# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| The Sherwin-Williams Company, *as successor to The Valspar Corporation*, | Civil No. 18-02964 (DWF/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Beazley Insurance Company, Inc., | |
| Defendant. | |

Andy Detherage, Esq., Christopher L. Lynch, Esq., John P. Fischer, Esq., and Patricia E. Volpe, Esq., Barnes and Thornburg, LLP, counsel for Plaintiff.

Charles A. Brinkley, Esq., John Randall Riddle, Esq., and Michael Keeley, Esq., Clark Hill Strasburger; Joseph A. Nilan, Esq., Gregerson, Rosow, Johnson, & Nilan, Ltd.; and Joel T. Wiegert, Esq., Hinshaw & Culbertson, LLP, counsel for Defendant.

## INTRODUCTION

This matter is before the Court on Defendant Beazley Insurance Company Inc.'s ("Beazley") motion for summary judgment. (Doc. No. 73 ("Motion").) For the reasons set forth below, the Court denies Beazley's Motion.

## BACKGROUND

This action relates to an insurance policy dispute involving a loss allegedly caused by a former employee of The Valspar Corporation ("Valspar"), a predecessor to the Sherwin-Williams Company ("Sherwin-Williams" or "Plaintiff"). For the policy period from April 20, 2016 to April 20, 2017, Beazley issued Valspar a Crime Insurance Policy

(the "Policy")) that included an Employee Dishonesty clause (the "Employee Dishonesty Clause")). (Doc. No. 1-1 ("Compl.") ¶ 6; *see also* (Doc. No. 87 ("Fischer Decl.") ¶ 4, Ex. 2 (the "Policy") at ¶ I.A., Beaz 000026 (the "Employee Dishonesty Clause").)

The Employee Dishonesty Clause provides that "the insurer shall indemnify the Insured or any Plan for loss of or damage to Money, Securities or Property resulting directly from Employee Theft or Employee Forgery." (Employee Dishonesty Clause.) The Policy defines Employee Theft as "the unlawful taking of Money, Securities, or Property to the deprivation of an Insured by an Employee, whether identified or not, acting alone or in collusion with others." (Policy at ¶ II.K, Beaz 000030 ("Employee Theft").)

The parties dispute whether Beazley improperly denied coverage after a now-former Valspar employee, Charles Cunningham ("Cunningham") approved numerous inflated invoices submitted by AmeriCoats, a toll-manufacturer, that allegedly deprived Valspar of approximately $3,500,000.[1] Sherwin-Williams contends that from 2013-2017,

---

[1] The parties agree that "toll manufacturing" is a term of art that describes an arrangement where a company with specialized equipment processes raw materials supplied by a customer to manufacture and supply a product for the customer, using the customer's raw materials, product formulae, and manufacturing processes (Doc. No. 86 ("Pl. Opp.") at 7; Doc. No. 74 ("Beazley Memo.") at 3.) The toll manufacturing arrangement between Valspar and AmeriCoats was governed by Toll Manufacturing Agreements ("TMAs"). (Doc. No. 89 ("Brown Decl.") ¶¶ 42-43, Exs. 26-27 ("TMAs").) Under the TMAs, AmeriCoats's pricing was based on the raw material price, processing fee, and a raw material loss factor based on the production quantity according to a set pricing schedule. (*See* TMAs.)

Beazley contends that as a toll-manufacturer, AmeriCoats was a third-party contractor. (Beazley Memo. at 3, 4, 6, 11, 13.) Sherwin-Williams argues that the term

Cunningham had the exclusive authority to approve AmeriCoats invoices for payment.[2] (Pl. Opp. at 20 (citing Doc. Nos. 91 ("Cessna Decl.") ¶ 5; 90 ("Jagger Decl.") ¶ 7; Fischer Decl. ¶ 5, Ex. 3 ("Brown Dep.") at 65, 144.)  Valspar discovered the loss in April 2017 after receiving an anonymous letter alleging irregularities in Cunningham's conduct relating to AmeriCoats.  (Fischer Decl. ¶¶ 14,15, Exs., 12-13; Brown Decl. ¶ 45, Ex. 29.)  Valspar investigated the allegations, determined that Cunningham had colluded with AmeriCoats to deprive Valspar of approximately $3,500,000, and terminated his employment.  (Brown Decl. ¶¶ 9-10, 46-47, Exs. 30-31.)  Plaintiff alleges that once Cunningham no longer had the authority to approve or to direct the approval of AmeriCoats invoices, the payment of invoices and overcharges stopped.  (Pl. Opp. at 6

---

"contractor," is ambiguous and does not clearly include toll-manufacturing relationships. (Pl. Opp. at 29-30.)  The Court declines to consider this argument because whether or not AmeriCoats was a contractor does not preclude summary judgment.  Notwithstanding, the Court notes that the TMAs provide that AmeriCoats is "an independent contractor engaged by Valspar to perform services under this Agreement . . . ."  (TMAS at VALSPAR0007756, VALSPAR0007771.)

[2]     When invoices did not match purchase order prices, Valspar's payment process for vendors triggered a Price Discrepancy Report ("PDR").  (*See* Brown Dep. at 61.) Payment of invoices at a higher price required a manager's approval. (*Id.*)  Plaintiff alleges that Cunningham repeatedly approved AmeriCoats's invoices at a higher price while declining to do so for other vendors.  (Pl. Opp. at 9 (citing Brown Decl. ¶¶ 6, 16, Exs. 2-22).)

       According to Plaintiff, Cunningham's approval of payment for an inflated invoice triggered payment of the invoice through Valspar's accounts payable department and that no further approval or decision-making was necessary.  (Pl. Opp. at 20 (citing Brown Decl. ¶ 8).)  While Cunningham was directed to transition the responsibility for approving AmeriCoats's invoices to a different Valspar employee in late 2016, Plaintiff alleges that Cunningham instructed that employee to follow his direction on approving the AmeriCoats payments.  (*Id.* at 5 (citing Jagger Decl. ¶ 6).)

(citing Brown Decl. ¶ 9; Brown Dep. at 37; Fischer Decl. ¶ 12, Ex. 10 ("Cunningham Dep.")[3] at 79-80 (pleading the Fifth Amendment).)  Moreover, Plaintiff alleges that Cunningham personally benefited from the theft, in part through establishing a shell company ("CEC Consultants, Ltd.") for the sole purpose of receiving proceeds from the theft.[4]  (Pl. Opp. at 1, 10-13.)

Plaintiff notified Beazley of its loss in April 2017 and sought coverage under the Policy for Employee Theft.  (Doc. No. 1-1 ("Compl.") ¶ 17.)  Beazley denied coverage in December 2017.  (*Id.* ¶ 18.)  In February 2018, Plaintiff asked Beazley to reconsider its denial of coverage; however, Beazley confirmed its denial in April 2018.  (*Id.*).  This lawsuit followed.  Plaintiff seeks a declaratory judgment, pursuant to Minn. Stat. § 555.01, that Beazley is obligated to provide coverage in excess of the Policy's $250,000 deductible.  (*Id.* ¶ 22.)

Beazley now moves for summary judgment on that grounds that Plaintiff is not entitled to coverage under the Policy because:  (1) the alleged overcharges do not constitute Employee Theft and therefore do not trigger coverage under the Employee Dishonesty Clause; (2) even if Employee Theft was involved, the Policy excludes

---

[3]   With an exception of responding to basic biographical questions, Cunningham pled the Fifth Amendment to all of questions posed during his deposition.  (*See generally*, Cunningham Dep.)

[4]   The record reflects that from August 2015 to April 2017, AmeriCoats paid CEC Consultants, Ltd. approximately $275,000, allegedly 10% of the proceeds AmeriCoats received from Valspar through the scheme to overcharge them.  (Fischers Decl. ¶¶ 13, 17-38, Exs. 11, 15-36; *see also* Pl. Opp. 1, 10-13).

4

coverage for any loss or damage caused directly or indirectly by any "contractor, independent contractor, subcontractor, or similar person or entity" ("Exclusion B.1."); and (3) if Exclusion B.1. does not apply, then an exclusion barring coverage for loss or damage sustained by Valspar directly or indirectly from Valspar "knowingly having given or surrendered Money, Securities, or Property in exchange or purchase with a Third Party, not in collusion with an employee" ("Exclusion A.18") applies. (Beazley Memo. at 1-2, 11-12; *see also* Policy at Exclusion B.1., Beaz 00035 ("Exclusion B.1."); Policy at Exclusion A.18, Beaz 000034 ("Exclusion A.18").)[5]

## DISCUSSION

### I.    Legal Standard

#### A.    Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the

---

[5]    In its entirety, Exclusion B.1. provides, "[t]he Insurer shall not be liable under Insuring Clause I.A., I.G or I.I. for loss or damage sustained by any Insured caused directly or indirectly by: 1. any agent, broker, factor, commission merchant, consignee, contractor, independent contractor, subcontractor, or similar person or entity[.]" (Exclusion B.1.)

Similarly, Exclusion A.18 provides, "[t]he insurer shall not be liable under any Insuring Clause for loss or damage sustained by any Insured resulting directly or indirectly from: 18. [t]he Insured knowingly having given or surrendered Money, Securities or Property in any exchange or purchase with a Third Party, not in collusion with an Employee; provide that this Exclusion shall not apply to loss under Insuring Clause I.E." (Exclusion A.18.)

evidence in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. State Law Controls

Because this case is before the Court based on diversity jurisdiction, Minnesota's substantive law controls the analysis. *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 388 (8th Cir. 2016); *Babinski v. Am. Family Ins. Grp.*, 569 F.3d 349, 351–52 (8th Cir. 2009). With respect to Minnesota state law, a district court is bound by the decisions of the Minnesota Supreme Court. *Qwest Corp. v. City of Des Moines, Iowa*, 896 F.3d 843, 845 (8th Cir. 2018).

Where there is no Supreme Court opinion directly on point, a district court may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data in order to determine how the state's highest court would decide. *Qwest Corp. v. Des Moines*, 896 F.3d at 845. When a state's high court has not decided an issue, it is "a well-recognized rule that federal courts may not reject a state court of appeals decision" solely for that reason, and where the appeals court "rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889, 897 (8th Cir. 2015) (quoting *West v. Am. Tel & Tel. Co.*, 311 U.S. 223, 237 (1940)).

  C. **Minnesota Insurance Law**

The parties agree that Minnesota law applies in this case. Under Minnesota law, interpretation of an insurance policy is a question of law. *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Interpretation of insurance contracts follows "the general rules of contract law, giving terms their plain and ordinary meaning to honor the intent of the parties." *Econ. Premier Assur. Co. v. W. Nat. Mut. Ins. Co.*, 839 N.W.2d 749, 752 (Minn. Ct. App. 2013).

Whether the language of an insurance policy is ambiguous is also a question of law. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979). "If the language of the policy is reasonably subject to more than one interpretation, there is ambiguity. If it is not reasonably subject to more than one

7

interpretation, there is no ambiguity." *Id.* Ambiguities are interpreted against the insurer, in favor of finding coverage. *Econ. Premier Assur. Co.*, 839 N.W.2d at 755. This serves the goal of protecting the insured, who is usually a "professionally unsophisticated consumer," but this rule applies even to a dispute between an insurer and a "sophisticated insured with equal bargaining power." *Id.*; *see also Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172 (8th Cir. 2012) (applying Minnesota law). However, courts should resist finding ambiguity where none exists (*Metro Prop. & Cas. Ins. Co. v. Jablonske*, 722 N.W.2d 319, 323 (Minn. Ct. App. 2006) (applying Minnesota law)), as they "have no right to read an ambiguity into the plain language of an insurance contract in order to construe it against the insurer." *Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 651 (Minn. 1986). Policies should be construed as a whole, giving unambiguous language its "plain and ordinary" meaning. *Id.* There is a presumption that the parties intended the language used to have effect (*Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990)), and an interpretation rendering any contract term or provision meaningless should be avoided (*Econ. Premier Assur. Co.*, 839 N.W.2d at 755).

Insurance policy exclusions must be given the same consideration as any other part of the contract in determining the scope of coverage. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880 (Minn. 2002). Courts are required to read policies in favor of finding coverage, construing words of inclusion broadly, but words of exclusion narrowly, and looking past the words used by the parties to the underlying allegations. *Westfield Ins. Co.*, 700 F.3d at 1174 (applying Minnesota law). The language of an

exclusion is to be interpreted in accordance with the expectations of the insured. *Thommes*, 641 NW.2d at 880. These expectations, in turn, are to be considered in light of the exclusion's purpose. *Am. Family Mut. Ins. Co. v. Peterson*, 405 N.W.2d 418, 422 (Minn. 1987). Notwithstanding, Minnesota's reasonable expectations doctrine is "extremely narrow and applies only on the few egregious occasions when an exclusion is disguised in a policy's definitions section." *Babinski v. Am. Family Ins. Grp.*, 569 F.3d 349, 353 (8th Cir. 2009) (internal quotation marks omitted). The doctrine does not apply where an insurance policy is not ambiguous and does not contain a "hidden" exclusion that would lead an insured to have objectively reasonable expectations regarding the terms that would have been negated only through "painstaking study" of the policy provisions. *Id.* (internal quotation and citations omitted).

## II.     Analysis

Having carefully considered the parties' submissions and arguments, the Court finds that disputes over the following issues of material fact preclude summary judgment.

### A.     Employee Theft

Beazley argues that coverage is barred because the alleged overcharges were not caused by Employee Theft when Cunningham did not seize or otherwise exercise control over the money that AmeriCoats paid to Valspar. (Beazley Memo. at 28-31.) Beazley asserts that "Cunningham, who was not part of Valspar's Accounts Payable Department, did not issue any payments to AmeriCoats, divert them to himself, or exercise any control over those payments, which were made by Valspar directly to AmeriCoats." (*Id.* at 29.) Therefore, Beazley argues that because Cunningham did not "take" the payments, as

9

required by the definition of Employee Theft, Valspar's alleged loss is not covered by the Policy's Employee Dishonesty Clause.[6] (*Id.* at 29-30; *see also* Doc. No. 97 ("Reply") at 11-12.)  Beazley relies largely on *Cargill, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Civ. No. A03-187, 2004 WL 51671, at *14 (Minn. Ct. App. Jan. 13, 2004) and Frazier Indus. *Co. v. Navigators Ins. Co.*, 149 F. Supp. 3d 512, 517-18 (D.N.J. 2015) to support its position. (Beazley Memo. at 28-29; Reply at 11-12.)

In *Cargill*, an unpublished opinion, the Minnesota Appellate Court considered whether the misappropriation of proprietary information in developing seed corn constituted employee theft under an insurance policy. 2004 WL 51671. The court found that improper use of a competitor's seeds did not constitute theft because "[t]he plain meaning of "taking" is "the act of stealing an article." *Id.* at *14. In *Frazier*, a federal district court in New Jersey found that a company whose employee that conspired with a contractor to inflate the contractor's bids did not constitute an unlawful taking under the company's crime insurance policy because the company's inability to obtain the lowest price did not unknowingly deprive it of money.[7] 149 F. Supp. 3d 512 at 517-18.

Plaintiff contends that "taking" does not require a physical act and cites to the record to argue that it has identified "voluminous evidence from which a jury could

---

[6] Beazley does not concede that Valspar suffered any loss. (Beazley Memo. at 11.)

[7] Notwithstanding, the *Frazier* court did find that any portion of the inflated bids the employee received as compensation for his role in the scheme constituted an unlawful taking of the employer's money and was a loss under the company's policy. *Frazier*, 149 F. Supp. 3d 512 at 518.

10

determine that Cunningham committed Employee Theft pursuant to the Policy's definition. (Pl. Opp. at 20-26.) The Court agrees.

Construing the evidence in the light most favorable to Plaintiff, as it must, the Court finds that there are genuine issues of material fact that preclude summary judgment. Specifically, this Court agrees with others that "taking" for the purposes of employee theft does not generally require a physical act.[8] *See, e.g.*, *Whitney Equip. Co. v. Travelers Cas. & Sur. Co. of Am.*, 431 F. Supp.3d 1223, 1227-1228 (W.D. Wash. Jan. 3, 2020) (finding that an employee who manipulated company's data to overstate profits and trigger employee bonuses was a "taking"); *Taylor Chrysler Dodge, Inc. v. Universal Underwriters Ins. Co.*, Civ. No. 08-4522, 2009 WL 3187234, at *4-5 (N.D. Ill. Sept. 30, 2009) (finding that a "taking" occurred when an employee deprived a company of $170,000 by aiding and abetting others to fraudulently obtain automobiles) ; *Morris Kirschman & Co. v. Hartford Fire Ins. Co.*, Civ. No. A. 03-1743, 2004 WL 1934848, *1 (E.D. La. Aug. 30, 2004) (finding that employee's manipulation of delinquent accounts

---

[8] The Court finds the cases Beazley cites distinguishable. In *Cargill*, the alleged theft involved trade secrets. Here, the alleged theft involved directing approximately $3,500,000 out of Valspar's bank account. Moreover, the Court declines to apply the non-binding precedent that a "taking" requires the act of stealing an article. In *Frazier*, while the court found that the inflated bids themselves were not a "taking," the portion of the inflated bids that the employee received did constitute a taking. Here, Cunningham allegedly benefited personally from the overpayments. Further, unlike *Frazier*, Valspar's alleged loss did not stem from knowingly paying for a less favorable deal from a deceitful contractor. Rather, it allegedly paid $3,500,000.00 over an agreed upon price. As discussed below, this Court agrees with others that "taking," for the purposes of employee theft, may be broadly construed and is not limited to "hands in the till" or physical control over a specific item.

amounted to a "theft" as defined in the policy because it was an "unlawful taking" which deprived employer of its property). Furthermore, the Policy does not specify such a requirement in its Employee Theft definition. Accordingly, the Court finds that a reasonable juror could conclude that Cunningham's actions constituted Employee Theft and that there was coverage under the Employee Dishonesty Clause.

### B. Causation

Beazley contends that even if Employee Theft was involved, the alleged loss is excluded under Exclusion B.1. because it "was caused directly or indirectly by AmeriCoats – a contractor, independent contractor, subcontractor, or similar person or entity." (Beazley Memo. at 13.) Beazley asserts that "it cannot be reasonably disputed that the alleged loss was caused directly or indirectly by AmeriCoats" when there would be no loss if AmeriCoats had not submitted inflated invoices. (*Id.* at 14; *see also* Reply at 6-7.)

Plaintiff argues that Exclusion B.1. does not apply because "AmeriCoats did not cause the loss, nor could it, because all it could do was submit an inflated invoice; it could not *cause* the invoice to be approved or paid." (Pl. Opp. at 30 (emphasis in original).) Plaintiff contends that because only Cunningham could approve the payment, he caused the loss. (*Id.*) Moreover, Plaintiff contends that Exclusion B.1.'s "reference to loss caused 'directly or indirectly' by a 'contractor' adds nothing to the policy's meaning, because 'direct' and 'indirect' causes, taken together, simply describe the universe of 'causes.'" (*Id.* at 31.) At a minimum, Plaintiff argues that "causation is a fact question that cannot be decided on summary judgment." (*Id.*)

Plaintiff argues further that Exclusion B.1. should be read as to distinguish between "Employees" and quasi-"Employees." (*Id.* at 32.) Plaintiff asserts that "if Exclusion B.1. is read to apply to those whom the Employee is in collusion with, it would negate all coverage for 'Employee Theft' committed 'in collusion with others,'" contrary to the plain terms of the Policy. (*Id.*) The Court agrees.

While Beazley appears to read Exclusion B.1. in isolation to conclude that it excludes any loss caused directly or indirectly caused by various types of quasi-employees/third parties, regardless of whether they acted alone or in collusion with an Employee, this would render the Policy's definition of Employee Theft to the extent that it includes "collusion with others" nearly meaningless.[9] The Court agrees that a more reasonable interpretation of Exclusion B.1. is that it is meant to distinguish between Employees and various quasi-employees/third parties and to bar coverage for alleged losses caused by various quasi-employees/third parties acting alone. If Cunningham played no role in the alleged loss, Exclusion B.1. may apply. Here, though, the Court finds that a reasonable juror could conclude that Cunningham caused or colluded to cause the alleged loss. Accordingly, the Court declines to rule as a matter of law that Exclusion B.1. bars coverage.

Beazley argues briefly in the alternative that if Exclusion B.1 does not apply, then coverage is barred by Exclusion A.18. (Beazley Memo. at 27; Reply at 10-11.)

---

[9]   Beazley relies on *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 806 (7th Cir. 2002) to support its position. There, unlike here, the third party did not collude with an employee of the victim company. (*See* Reply at 2-3.)

Exclusion A.18 bars coverage for loss resulting from "the Insured knowingly having given or surrendered Money . . . in any exchange or purchase with a Third Party, not in collusion with an Employee[.]"  (Exclusion A.18.)  The Court finds that this argument fails as well.  As discussed above, the Court finds that a reasonable jury could conclude that Cunningham, an employee, caused or colluded to cause the alleged loss.  Moreover, the Court cannot conclude as a matter of law that Valspar "knowingly" gave or surrendered money to AmeriCoats or anyone working for AmeriCoats.  Based on the record, the Court finds that a reasonable juror could conclude that Valspar did *not* do so knowingly.  Accordingly, the Court cannot conclude as a matter of law that Exclusion A.18 bars coverage.

## CONCLUSION

For the reasons set forth above, the Court finds that disputes over issues of material fact preclude summary judgment.  In short, the Court finds that a reasonable juror could conclude that Cunningham's actions constituted Employee Theft and that there was coverage under the Employee Dishonesty Clause.  Moreover, the Court cannot conclude as a matter of law that coverage is barred by Exclusion B.1. or Exclusion A.18.

## ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Beazley Insurance Company Inc.'s Motion for Summary Judgment (Doc. No. [73]) is **DENIED**.

Dated:  July 23, 2020         s/Donovan W. Frank
                              DONOVAN W. FRANK
                              United States District Judge